Carlos Ramirez for Plaintiffs Kepi Moore, Molly Brown, and Audrey Scheffler. Good morning, Your Honors. May I please reserve two minutes for rebuttal? Your Honors, this case is a very good example of why a district court, at the motion-to-dismiss stage, without a fully developed record before it, should not make a determination as a matter of law that a statement was not misleading. We know that now because just a few months ago, another U.S. district court, out of the Northern District of New York, did in fact find that the plaintiff there, on facts virtually identical to the present facts, that she had in fact established that defendant's statements had indeed misled her. With two judges now disagreeing as to the misleadingness and deceptiveness alleged in this case, plaintiffs would submit that that is proof that an issue of fact does exist here that should be submitted to a fact finder at trial. And if that is not enough, Your Honors, to persuade this court to reverse the district court finding, the complaint here is replete with facts that do establish that defendants have engaged in deceptive actions. For example, this company was started for, according to the founder, for the specific purpose of saving women's lives from the harsh chemicals typically found in hair color products. To that extent, Madison Reed identified several, quote-unquote, harsh ingredients, their words, not plaintiff's, removed them, and replaced them with good stuff. Again, good stuff is in quotes. Except the problem there is that the no ammonia representation on the front label, which clients have alleged meant to them that the product was healthier, safer, was indeed not. Why? Because it was replaced with ethanolamine. Ethanolamine, ironically, is composed of ammonia, the very harsh ingredient that Madison Reed claimed it removed, and we can see they did remove. It's not composed of ammonia. Isn't the use of ammonia in the process of making the chemical? Your Honor, ammonia is meant to open the cuticle for the hair color to enter the hair, and then it's closed up so that it remains permanent. The problem here is that ammonia had to be replaced by ethanolamine, but the reasonable consumer of hair color products does not know that. The reasonable consumer of hair color products also does not know that ethanolamine causes 85 percent more hair loss, 85 percent more damage to hair, which plaintiffs have alleged they suffered, as well as hair loss. Mr. Ramirez, is your claim that there is some duty to provide those disclosures on the package? Your Honors, yes. If you look at the laboratory factors, factor two basically says that if you have material information, which the defendant did, that will help. In fact, I can read the factors right now, Your Honor. If you have material information, which the defendant clearly had as a manufacturer, and I need my reading glasses now, that is unknown to the plaintiff, then you have to disclose it. Here, the unknown fact was that ethanolamine was worse than ammonia, and it was composed of ammonia and a known carcinogen, according to the EPA. But the statement that you're talking about just says free of ammonia, right? I don't know. Why do you think it implies all these things that you're saying? Well, Your Honor, it does. That's what the clients and the plaintiffs have alleged. We need to accept those facts as true, and we need to have them construed in the light most favorable to plaintiffs. And based on the other information that we've cited in the complaint, where dozens upon dozens of people have actually understood these claims to mean that no ammonia means it's a healthier, safer, better product, they also stated they removed PPD. PPD, let's call it the peanut of hair color ingredients. It is the ingredient that will most likely cause an allergic reaction. Now, imagine the mother who walks into a store and gets a box that says no peanuts, only to find out when the child has an allergic reaction that peanuts was replaced with something that is not called peanuts. Here, PPD was replaced with something called PTDS. PTDS causes the same allergic reaction in one out of two. But this is all disclosed on the ingredient label, is it not? Your Honor, the problem is that, first of all, three things. Number one, the reasonable consumer of hair color products. In fact, I would challenge anyone here to tell me whether or not they've heard of ethadolamine before. The reasonable consumer of hair color products looking to confirm whether ammonia is in the product or not would not know that it would have to be replaced, number one. Number two, they would not know the name of the ingredient that would replace it. And number three, they would not know whether or not that ingredient was worse or better. Certainly not standing in the aisle of a supermarket. And I would point to the Reed v. Johnson case, Ninth Circuit Court of Appeals case. There, the plaintiff alleged that a no-trans fat representation led her to believe that there was no trans fat. The defendant argued, well, in the ingredient list, we listed partially hydrogenated oil. That should have told you that there is trans fat because that is a trans fat. The Court there said the reasonable consumer could not be expected to know that hydrogenated or partially hydrogenated oil is, in fact, a trans fat. That is Reed v. Johnson. Mr. Ramirez, these claims about safer, gentler, even better are not claims that they're making on the label. So the reasonable consumer in the aisle is looking at something that says it's free of something. They can turn it around and say, no, that's not in there. It's got these other things. What are we how are we supposed to connect those allegations that are still properly in the record about the general marketing on the Web site or other things? And how do those provide context for just a simple statement that free is misleading when that's true? Well, Your Honor, going back to the peanut analogy, free of peanuts to that mother, with the alerted child means a product is safer. The child will not have an alert reaction. Here, and we need to focus on the targeted consumers, not on the general population, targeted consumers. To them, ammonia means safer, better. Let's go back to what Madison. Have you alleged that anything in the back, anything that's actually in the product, contains the same types of active ingredients as the things that the product is free of? Your Honor, I'm not understanding the question. Well, the product says it's free of various things, and your position is, but it does have some other things that make hair, that can damage hair, right? That's how I understand the theory of this case. So the question is, you know, does the product actually contain active ingredients that are the same as the ones that it's free of? Well, yes. Ammonia was replaced with ethanolamine. But to the reasonable consumer of hair color products, that's Madison Reed's target, no ammonia means better, healthier. No PPD for the person who's allergic to PPD means I'm not going to die of an allergic reaction because the ingredient has now been removed from the product. And what the reasonable consumer of hair color products doesn't know, like the consumer in the Reed v. Johnson case, is that those products needed to be replaced with something else. And what they replaced it with, and the rub here is that they replaced it with something that's worse. And again, going to the reasonable consumer, whose allegations we have to accept as true, no ammonia, and this is where it's allegedly complete, no ammonia means safer, better. Just look at Madison Reed's own words. We took the harsh ingredients out and put good stuff in the products. And as courts have found in the past in this circuit, you can look at things beyond the box. You can look at websites. Even the judge in this case did refer to, in connection with one of the allegations, although he sided with the defendant on this one, that certain disclosures on the website could be relied upon. So to the extent that, and again, we have to go back. This is not the reasonable consumer in general. It's the targeted consumer. We cannot sit here and make a judgment about what plaintiffs, as users of hair color products, not me, not many people in this room, perhaps, if they're younger, we cannot discount what they're telling us. We, at a minimum, have to present it to a jury, which is exactly what Cedar Judge Sharpe in the Northern District of New York said that needed to happen in this case. Well, Judge Sharpe did say that there were some legal and factual differences between that case and this one, right? Your Honor, as a person who drafted both complaints, I can tell you that it's pretty much the same complaint. Well, some of the allegations here, I mean, some of the allegations here are time-barred, and you haven't appealed that. No, we haven't, Your Honor. This appeal is focused solely on the representations on the label, and to the extent that other representations on the website were relied upon by the individuals here, then, you know, if they're not barred by the statute of limitations, well, we would ask the court to consider them at a minimum for background, at a minimum for establishing the intent to target these people. And by the way, Your Honor, the fact that this is sold at double to triple the amount that you would typically pay for something similar at a drugstore further cemented to plaintiffs that they were getting a better product. You know, more R&D was done in connection with the product. Higher quality ingredients cost more money. This is all common sense stuff. To help us understand this reasonable probability, you know, a legal rule that we're drawing, I have to draw with respect to the complaint. What would it take for this not to be misleading under your theory? Is it something on the box? Is it something on the website? We would like both. Perhaps an asterisk that's to the words no ammonia that say, hey, there's no ammonia, but it's been replaced with something called ethanolamine. And how is that different from the just turning the box 90 degrees and seeing the ingredient label? Well, Your Honor, I believe that you would need a degree in chemistry and probably one focused on the beauty and hair and color industry because, again, I'd never heard of ethanolamine until I started working on this case. So for the reasonable consumer of hair color products to stand in an aisle and to figure out that ammonia was replaced by ethanolamine, that's an impossibility. I interrupted you, so the asterisk, anything else? Well, I think defendants should stop saying that they took harsh ingredients out and they replaced it with good stuff because, frankly, if it were me, I would prefer having ammonia in the product and keep my hair and not have it damaged and not be exposed to the risk of cancer than having. How is these terms harsh, good stuff? Why are these not puffery? They're not because of the context that they're used in. Specifically, hair color users do associate ammonia with the harsh, that it's harsh. It's caustic. It's used to clean. Unfortunately, it's also used on hair, and it smells horribly. All of those things would lead the reasonable consumer of hair color products to basically buy in that this is harsh based on their experience. And, again, going back to the no PPD, that implies to the person who is allergic to it that, in fact, they won't suffer an allergic reaction, but one out of every two of those people that buy it based on representation will suffer an allergic reaction. So where was the no harsh ingredients statement made, on the website? Your Honor, it's made on the website. It is made ad nauseam on the Airwaves SiriusXM radio in mass mailings, which I've actually received, ironically. Have your clients alleged that they relied on those or viewed those? Yes, Your Honor. If you go through the complaint, you will see that plaintiffs, Keppy Moore did not, but Audrey Scheffler and Molly Brown did, in fact, allege that they relied on those statements on the website. And let's face it, Your Honor, in this day and age, the first thing you do when you find out about a product, you go to the website and you research it. And the website is full of what we would concede some of it is puffery, but certainly if you take an ingredient that people generally don't want to put on their hair or body and you confirm that it's harsh and then you say that we took it out to save your life, it doesn't take a degree in rocket science to know that basically they're implying that this is healthier, better. Do they make the claim that the replacement ingredients are not harsh? Well, they don't disclose the replacement ingredients, which are virtually unknown to, frankly, anyone, certainly the user of hair color products. Well, we've kept you on the run here, so why don't we put two minutes on the clock for rebuttal when you come back up. Thank you, Your Honor. Thank you, Mr. Ramirez. Good morning, and may it please the Court. My name is Jason Richardson, and I represent defendant and appellee Madison Reed, Inc. This court should affirm dismissal because through their appeal, plaintiffs have not identified any facts pled with particularity to show conduct by Madison Reed likely to deceive a reasonable consumer. Plaintiff Keffi Moore at an Ulta Beauty location saw a box of Madison Reed's products with the words written on it, quote, free of ammonia, parabens, resorcanol, PPD, phthalates, and gluten. That representation was the only representation that Ms. Moore alleges having seen or relied upon. That representation, Your Honors, is not likely to deceive a reasonable consumer for two fundamental reasons. First of all, there isn't anything about the representation itself that is deceptive in nature. And second, even if this court were to glean some possibility of deception or an ambiguity that might be interpreted, the ingredient list serves to cure that potential ambiguity. And I'm going to talk about both of those reasons in depth here, beginning with the fact that the representation itself was not deceptive in nature. A good place to start in that analysis is the fact that this simple free of representation is simply and admittedly completely accurate. Now, while technical accuracy does not in and of itself mean that the representation is not likely to fall afoul of the reasonable consumer standard, it is a good place to start and where, as here, there is a simple, admittedly accurate, and unadorned representation that does nothing more than identify an ingredient not contained, California law holds that such a representation is not likely to deceive a reasonable consumer. Where does the no harsh ingredients, I'm paraphrasing, but the reference to this isn't harsh come in? Not on the product, but on a website or on something else? And which of those are time-barred and are there issues with who saw what? Well, for Ms. Moore, it does not come in at all. It was just the representation on the box. For Ms. Shuffler, the claims cannot be asserted under California law at all, a determination that has not been appealed. This is the Ohio issue? I'm sorry? This is the Ohio issue? Correct. And for Ms. Brown, the only representations that she saw which were not time-barred were seen in September of 2017 and March of 2018. They were, and I'm going to quote them, at paragraphs 86 and 84 of the second amended complaint respectively, quote, salon gorgeous, quote, ingredients with integrity, quote, salon quality, and quote, ammonia free. The first three of those four representations, I think, are textbook examples of puffery, as the court pointed out. And the last representation, ammonia free, which was also the case for Plaintiff Moore, is simple, accurate, and unlikely to deceive. Mr. Richardson, what are we supposed to do? I'd like you to respond to the peanut idea, right? There's lots of peanut, gluten. There are these areas where they take on certain context, which we have considered before. How would you respond to that hypothetical here? Sure. Well, first of all, I would point out what it is that plaintiff is alleging was omitted, which is, as Judge Oreck pointed out, not clear. At page 20 of the record, Judge Oreck makes a point of pointing out it's not clear what they're alleging was concealed because, as this court noted, the ingredient list was fully disclosed. But the peanut analogy is not a particularly appropriate one because if a consumer suffers an analogy – excuse me – suffers an allergy to peanuts, that can be potentially life-threatening or even fatal. That is not the case here. Plaintiffs do not allege that there is anything that even comes close to that level of severity. In fact, at paragraphs 28 and 29 of the second amended complaint and paragraph 16 of the first amended complaint, the only thing any of these plaintiffs allege suffering is a relatively mild allergic reaction. And if this court looks at the warning provided by Madison Reed at the supplemental excerpts of record, page 149, that warning – what plaintiffs are alleging occurred here. This was in the request for judicial notice? It was. That was granted? Yes, I believe both sides requested that the court took judicial notice, but it could also be considered through incorporation. Important safety warnings. All permanent hair color contains ingredients which can cause an allergic reaction, which in rare cases can be severe. Therefore, you must follow these precautions. And then it goes on to describe the patch test that all consumer hair dye products require folks to take. So even if there were the type of allergic reaction that plaintiffs are alleging might happen, it's been more than covered by the warning that is literally the first words on the side of the box, as the court noted, a reasonable consumer could turn over and look at. So what are the differences between this and the Moore case in New York? Yeah, absolutely. The differences are twofold. First of all, that case involved a different pleading standard. And second of all, that case involved different facts. Now, Judge Sharp in the Moore case did not, contrary to what has been suggested, differ based on the same factual presentations. But I want to start, importantly, with the pleading standard. And I'm going to quote briefly from footnote four of that decision. There, Judge Sharp noted, quote, The court notes that the Northern District of California matter was brought pursuant to California consumer fraud statutes, which must be pleaded with particularity. As discussed herein, Moore's New York statutory fraud claims are only subject to the pleading standard contemplated by Rule 8 of the Federal Rules of Civil Procedure. And as this court is, of course, aware, that is a much more permissive pleading standard. In addition, the court noted that there were factual allegations that went well beyond what we have alleged by either Plaintiff Moore or Plaintiff Brown to the extent that her claims are not time barred. And in fact, Judge Sharp in that case pointed to allegations and identified them as being indisputably puffery, noting particularly, quote, ingredients you can feel good about, which I think the court would very likely agree tracks pretty closely with ingredients with integrity, which is what Ms. Brown alleged having seen online. At what level do these, so we have a case that makes claims dealing with prescription dog food or what puppies eat. At what level does this manufacturer's claims about harsh chemicals seeming to say, well, ammonia is bad for you. This has only good stuff in it. At what level does that kind of add the kind of context where a manufacturer would be under some heightened duty to say more than just free of and actually explain what's in it? So a couple things in regard to that. First of all, the contains no harsh ingredients, and many of the contents from the website that the plaintiff's counsel quoted were not seen or relied upon. And that makes a difference because under Kwikset and under Ebner and McGinnity, this court's line of jurisprudence to plead with particularity a consumer statutory fraud claim, the plaintiff has to allege and identify having seen and relied on and purchased as a result of that. So that wouldn't have resulted in the purchase for any of these consumers. But comparing the types of representations in Moore v. Mars Pet Care, there we had representations that prescription dog food did not require a prescription, where in fact, I'm sorry, representations that it did require a prescription, whereas under guidelines it did not, and that was seen to have been deceptive. Here, there is no representation, and there's nothing from the content or context of the box itself that is likely to deceive a reasonable consumer. What plaintiffs are relying on is what the court in Schaeffer v. Califia Foods described as a series of, quote, inferential leaps, and the court in Schaeffer rejected an attempt to plead consumer fraud based on such inferential leaps because to do so, and I'm going to quote very briefly from that decision as well, the court would have to adopt a theory, quote, upon which almost any advertisement truthfully extolling a product's attributes would be fodder for litigation. Those considerations that applied in Schaeffer apply with particular force here because, as the court noted, well, all Ms. Moore saw was a representation of what was not contained. But even if this court were to glean some possibility of deception, some ambiguity, this court's Ebner decision and the court's McGinnity decision teach that the ingredient list, which was plainly displayed on the side of the box, would ameliorate or cure any potential ambiguity. Plaintiffs argued in their brief that Williams suggests that the ingredient list cannot cure the ambiguity, but that's not the case, and Ebner specifically noted the limits of Williams' applicability. Ebner explained with regard to Williams, quote, stated straightforwardly Williams stands for the proposition that if the defendant commits an act of deception, the presence of the fine print revealing the truth is insufficient to dispel that deception. And this court's McGinnity decision issued just a few months ago further clarified, explaining, quote, the front label must be unambiguously deceptive for a defendant to be precluded from insisting that the back label be considered together with the front label. The McGinnity decision went, and obviously I think plaintiffs might, to your question, look at certain content online and say, well, that's a little bit suggestive of certain themes, or when we say harsh ingredients, that might suggest something. It might be ambiguous the same way that the shampoo image of a diamond or an avocado in a leaf in McGinnity was seen as ambiguous. But it isn't unambiguously deceptive, and McGinnity teaches that it must be in order for a plaintiff not to rely on the ingredient list. Would it matter if the label said free of harsh chemicals like ammonia? I'm trying to get at to what extent we've considered context in this motion to dismiss posture. That would be a slightly different case, but I would point to a couple things in regard to that. First of all, the ingredient list would serve to cure. But second of all, and this goes to some of what we heard from appellant's counsel, harsh is an intrinsically subjective term. And when plaintiffs suggest that a product that is free of ammonia, therefore, will not have harsh chemicals, there is nothing about the representation on the box or online that makes the type of highly specific comparisons that plaintiffs attempt to test these representations against regarding the toxicity levels of ammonia versus ethanolamine or any of the other highly specific attributes that they, an entity called the Environmental Working Group, have chosen to test it against. When a consumer, a reasonable consumer, looks at harsh chemicals, harsh, including in the context of ammonia, can mean any number of things. And it's important to keep in mind that a reasonable consumer might prefer a product that does not contain ammonia for a host of reasons, beginning, first and foremost, with its harsh odor, which Madison Reed's products does not contain. In addition to the odor, plaintiffs may, or, excuse me, consumers may prefer products that do. The allegation is that ethanolamine does contain a similar odor to ammonia, correct? It does not. It does not contain an ammonia-like odor, and I don't think that would be challenged. But even setting that aside, there are a host of other factors, including the look and feel, the color, the effectiveness, the consistency of results, and, indeed, the extent to which it might interact with one's skin and hair. And that is not something that is objectively determined by a rote metric of the Environmental Working Group. Reasonable consumers prefer different hair products for a variety of reasons. I guess if it's pleaded here, those things are pleaded in the complaint, in terms of the effects on people who have allergies, maybe other effects. What are we supposed to do with it, in other words, with this idea that there is a context that ammonia is harsh and the ingredients in your product is not? Well, again, that wouldn't even come into play for Ms. Moore, who didn't see any representation of harsh ingredients, nor, for that matter, would it come into play for Ms. Brown, who only saw puffery and the undisputedly true fact, excuse me, true representation that it does not contain ammonia. So I think that if the term harsh were used in a highly specific context, talking about toxicity levels as measured under a certain metric, then it might do some work. But harsh, as a case law we've cited, and as I think most reasonable consumers will know, is an intrinsically subjective representation. But Brown did not see that. I'm sorry? Brown did not see harsh? That's correct. My understanding, and again, and I want to make a distinction here, Brown did see some of those things in representations that were time-barred, which Brown alleges having seen in early 2016. But Brown alleges having seen, when visiting Madison Reed's website, for the purpose of, give me just a moment. Integrity, Salon Gorgeous, ammonia-free. Right. For the purpose of changing the color that she had already been purchasing in September of 2017, and then for the purpose of changing a shipping date, saw Salon Gorgeous, ingredients with integrity, salon quality, and ammonia-free. I see that my time is expiring. So unless there are any further questions, I would respectfully urge the Court to affirm. Okay. Thank you. Thank you. Your Honors, I'd like to start off by correcting the standard here. It is not the reasonable consumer standard. It is actually a lot narrower in this case. And I'll just read the standard from the McGinnity case. The reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers acting reasonably in the circumstances could be misled. While Your Honors, myself, may not be misled by a box that has the words no ammonia hair color product, women that use this on a regular basis interpret it differently. They interpret no ammonia to mean it's safer, it's healthier. So I wanted to make that correction. A few things. Let's just use common sense here. Let's throw out the law. Madison Reed did not pull these ingredients out of thin air. And likely, if the complaint is reinstated and we're allowed to proceed to discovery, we'll find documents, perhaps studies, consumer surveys, that in fact show that people that use these products assign a meaning to no ammonia, no PPD, no resource at all. For Madison Reed now to imply this messaging, which we know it didn't just make up, to then turn around and put in replacements that are much worse, that could even cause cancer, is unconscionable. I would argue that ingredients with integrity is not puffery. Just look at the Webster's Dictionary definition of integrity. When you act with integrity, you do what's right, especially when they had material information. If this were an omission case, there was a defect alleged. All you have to do is look at the case. I could give it to the court, but the fact is when there is an omission, oh, the child labor case, Hodgson v. Mars. There, the court found that if you allege an omission and that omission has to do with a defect, which the court here found that the omission that we actually plausibly planned that the products pose a safety hazard, then you could find that there was an omission, an actionable omission alleged here. I see I'm out of time. Am I? Great. Well, thank you very much for your argument this morning, Mr. Ramirez, and we thank both counsel for the helpful briefing and arguments. This matter is submitted. Thank you. Thank you.
judges: THOMAS, BRESS, JOHNSTONE